IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KRISTINA CONSTANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| | ) | 11-0455-CV-W-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kristina Constant seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the Appeals Council erred by not considering the new evidence, i.e., a Medical Source Statement - Mental, and (2) the ALJ erred in failing to fully develop the record with respect to plaintiff's physical abilities. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On June 28, 2007, plaintiff applied for disability benefits alleging that she had been disabled since February 8, 2007. Plaintiff's disability stems from degenerative disc disease, bipolar disorder, and anxiety disorder. Plaintiff's application was denied on August 9, 2007. On July 23, 2009, a hearing was held before an Administrative Law Judge. On January 29, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On March 8, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

>Yes = not disabled.
>No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

>No = not disabled.
>Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

>Yes = disabled.
>No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

>No = not disabled.
>Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

>Yes = disabled.
>No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Waddell, in addition to documentary evidence admitted at the hearing and presented to the Appeals Council.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff earned the following income from 1995 through 2007:

| Year | Income |
|------|--------|
| 1995 | $ 249.58 |
| 1996 | 822.26 |
| 1997 | 0.00 |
| 1998 | 355.96 |
| 1999 | 0.00 |
| 2000 | 4,771.60 |
| 2001 | 3,175.82 |
| 2002 | 0.00 |
| 2003 | 1,600.79 |
| 2004 | 2,505.46 |
| 2005 | 2,131.41 |
| 2006 | 5,131.68 |
| 2007 | 238.88 |

(Tr. at 121).

Case 4:11-cv-00455-REL   Document 13   Filed 07/06/12   Page 4 of 37

**Disability Report - Adult**

In an undated Disability Report, plaintiff stated that the "illness, injuries, or conditions that limit her ability to work" consist of bipolar disorder, anxiety, and phobias (Tr. at 143). When asked to explain how her condition limits her ability to work, plaintiff wrote, "I do not have the ability to make correct decisions all the time. I have phobias about germs and food. My panic attacks are so severe that I am not able to swallow or breathe. I cannot concentrate on one thing very long. The medications that I take make me pretty drowsy." (Tr. at 143). When asked why she stopped working, plaintiff wrote, "My panic attacks became severe enough that I was no longer able to work." (Tr. at 143).

**Function Report**

In a Function Report dated July 9, 2007, plaintiff described her day as follows:

I wake up at 9:00 a.m. and take first medications and give my eldest son his ADHD medication. Then brush teeth and get clean. We then have breakfast. Then kids get dressed. I then set [sic] and relax until my mediciane [sic] starts to work then I will vaccum [sic] or do laundry depending on how tired the meds make me or how nervous I am, around noon we all eat lunch. I'll watch the kids play. After that the kids come in and wash and sanitize there [sic] hands then I wash things and sanitize door knobbs [sic], remotes, etc. Around 4:15 my husband comes home and he and I fix supper. We then do dishes take more meds and go to the living room until bed. At noon I have meals then again at bedtime if anxiety starts sometimes I go for a walk to calm down.

(Tr. at 152, 158).

Plaintiff reported that her condition poses no problem with dressing, bathing, caring for her hair, or using the toilet (Tr. at 152). Plaintiff can do laundry, do dishes, bleach the bathroom and sanitize things, and she spends two hours every other day performing these tasks (Tr. at 153). She drives; and she shops for food, household goods, and clothes for an hour about once a week (Tr. at 154). She visits with her family and takes the kids to the park once or twice a week (Tr. at 155). She indicated that she cannot "sit still a lot" and her lifting is limited due to "loss of muscle and weight with ulcers" (Tr. at 156). She can walk a mile and

5

then needs to rest for about 15 minutes (Tr. at 156). She can follow spoken instructions but needs to re-read written instructions (Tr. at 156).

B.     *SUMMARY OF MEDICAL RECORDS*

On February 5, 2007, plaintiff saw Angela Guest, M.S., at Burrell Behavioral Health Services ("Burrell") for an annual assessment for Community Psychiatric Rehabilitation Center ("CPRC") services (Tr. at 407-412). Plaintiff reported anxiety, panic attacks, germ phobia, feelings of choking, and racing thoughts. She said that her impairments cause no impact on her legal situation or sexual functioning; minimal impact on her marriage, relationships, family, hobbies, play activities, and ability to control her temper; moderate impact on her friendships and peer relationships, activities of daily living, and ability to concentrate; and severe impact on her job performance and financial situation. Plaintiff said her job was stressful, she had cut her work to three days per week, and she wanted to start nursing school. She listed her only medication as Prevacid (reduces stomach acid) and her only significant medication condition as a stomach ulcer. Ms. Guest noted diagnoses of panic disorder, obsessive compulsive disorder, and bipolar disorder and a GAF of 51.[1] Ms. Guest recommended that plaintiff participate in CPRC rehabilitation services and train to become a licensed practical nurse ("LPN").

On February 26, 2007, plaintiff was seen at the University of Missouri Health Care Behavioral Health Services - Carroll County and was seen by Ms. Guest for an individual treatment and rehabilitation plan (Tr. at 404). Ms. Guest diagnosed plaintiff with panic disorder, obsessive compulsive disorder and bipolar disorder (Tr. at 411). Ms. Guest assessed

---

[1]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

6

plaintiff with a GAF of 51 and observed that her anxiety, panic and stress cause difficulty in functioning (Tr. at 411). Ms. Guest also noted that plaintiff had reduced her work to only three days per week due to psychological symptoms (Tr. at 411). Ms. Guest further noted that plaintiff has a germ phobia and experiences several weeks of increased mood followed by several weeks of decreased mood (Tr. at 411).

On March 16, 2007, plaintiff was seen at Burrell for an initial psychiatric evaluation with Glenna Burton, M.D. (Tr. at 267-270). Plaintiff had previously received treatment at Burrell and was diagnosed with bipolar disorder but lost her Medicaid in 1999. Plaintiff reported panic attacks, anxiety and an episode of depression four to five months earlier which included crying, loss of appetite and an inability to keep a job. Plaintiff endorsed other symptoms including racing thoughts and poor concentration. Dr. Burton noted that plaintiff was cooperative, exhibited normal affect, fair eye contact and no psychotic features. Dr. Burton estimated that plaintiff was of average intellectual functioning. The evaluation lasted 45 minutes, and Dr. Burton diagnosed plaintiff with bipolar disorder type I[2] and panic disorder and assessed her with a GAF score of 60 (see footnote 1). Dr. Burton prescribed Depakote[3] 1250 mg daily, Wellbutrin[4] 350 mg three times per day, and Xanax[5] 0.5 mg as needed. That

---

[2]Bipolar I disorder involves episodes of severe mood swings, from mania to depression. Bipolar II disorder is a milder form, involving milder episodes of hypomania that alternate with depression.

[3]Depakote is "used to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder (manic/ depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods)."

[4]Wellbutrin is used to treat depression.

[5]Xanax (alprazolam) "is used to treat anxiety disorders and panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks). Alprazolam is in a class of medications called benzodiazepines."

same day Dr. Burton signed the assessment and treatment plan forms completed earlier by Ms. Guest (Tr. at 404, 412).

On April 6, 2007, plaintiff returned to Burrell and was examined by Dr. Burton (Tr. at 271). Plaintiff reported that she took Depakote for four days and her mood was pretty good. She said her concentration was better, her appetite was good, and she had no depression. She reported a couple days of hypomania.[6] Dr. Burton continued her diagnosis of bipolar disorder and refilled the same prescriptions.

On June 1, 2007, plaintiff returned to Burrell for an examination with Dr. Burton (Tr. at 272). Plaintiff reported side effects from her medications including drowsiness, but she had experienced only two panic attacks since the previous visit. She reported better sleep, more energy and increased appetite. Her concentration was good.

On August 3, 2007, plaintiff saw Dr. Burton and reported irritability, stomach troubles, and financial stress (Tr. at 403). Plaintiff said her sister had moved in and they were "very busy" taking care of the seven children in the house. Dr. Burton diagnosed bipolar disorder with mood ranging from euthymia (a relatively stable mood state) to mildly depressed, and she adjusted plaintiff's medications, adding medication for gastrointestinal distress.

On August 9, 2007, Joan Singer, Ph.D., completed a Psychiatric Review Technique and found that plaintiff suffered from bipolar disorder and panic disorder (Tr. at 277-287). Dr.

---

[6]A hypomanic episode is not a disorder in itself, but rather is a description of a part of a type of bipolar II disorder. Hypomanic episodes have the same symptoms as manic episodes with two important differences: (1) the mood usually is not severe enough to cause problems with the person working or socializing with others (e.g., the person does not have to take time off work during the episode), or to require hospitalization; and (2) there are never any psychotic features present in a hypomanic episode. A hypomanic episode is characterized by a distinct period of persistently elevated, expansive, or irritable mood, lasting throughout at least four days and present for most of the day nearly every day. This hypomanic mood is clearly different from the person's usual mood.

8

Singer found that plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation (Tr. at 285). She completed a Mental Residual Functional Capacity Assessment and found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

She found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

She found that plaintiff had no marked limitations.

In support of her findings, Dr. Singer stated in part as follows:

Claimant worked until 2-8-07 as a cook in a restaurant when she became unable to work due to her condition. Claimant first started treatment for her mental impairment in 3-07. . . . Evaluation noted good memory and at least average IQ. Claimant was diagnosed with bipolar disorder and panic disorder. She was started on psych meds. She followed up on 4-6-07 had reported improvement in mood. She reported that she had a couple of days of hypomania. She reported some word finding difficulty. Claimant followed up again on 5-1-07. She complained of only 2 panic attacks. She reported that she is irritable and edgy and that noises bother her. She reported that she was sleeping better and that her energy is good. Examiner noted concentration was good but the claimant had some word finding difficulty. There wasn't [sic] any reports of crying or si/hi [suicidal ideation/homicidal ideation]. No evidence of any psychotic symptoms.

* * * * *

. . . MER [medical records] notes that claimant was having difficulties when she first started treatment in 3-07. However she has shown some improvement with medication as indicated by the last MER notes in 6-07 indicating limited panic attacks and increased appetite. Examiner also noted good concentration. She reported that her energy was pretty good but continued to complain of some word finding difficulty. MER supports improvement in the claimant's condition with medication. . . [S]he did not have any difficulties in her teleclaim with the CR. Despite her condition, she continues to care for her children, perform household chores, and cook on a fairly regular basis. . . . The claimant doesn't have any history of IP [inpatient] stays or ER [emergency room] visits for anxiety for anxiety related symptoms.

Based on the total evidence, the claimant is capable of SRT [simple repetitive tasks] on a sustained basis now and prior to DLI [date last insured] of 6-30-07.

(Tr. at 275).

On August 3, 2007, plaintiff returned to Burrell and was examined by Dr. Burton (Tr. at 403). Plaintiff reported sleeping late that day and that she gets really exhausted. She was much less irritable but was having a bit of stomach trouble. "The past week has been very busy with her sister here. Together they have 7 kids. . . . There are financial stresses. . . . Appetite is better. Concentration is the same." Dr. Burton recommended taking Depakote three times per day, for a total of 1250 mg.

On September 9, 2007, plaintiff reported to Burrell for problems distinguishing between anxiety, mania and depression and was examined by Dr. Burton (Tr. at 402). Plaintiff reported being easily agitated, especially with the noise level. She further reported insomnia and waking up at 3 a.m. Plaintiff told Dr. Burton that her concentration was very poor. She indicated that she had had a "medical hearing" two days earlier. Dr. Burton decreased plaintiff's Wellbutrin to 150 mg per day and added medication for gastrointestinal issues (Tr. at 402).

On November 2, 2007, plaintiff presented to Burrell, was examined by Dr. Burton and reported that she left her husband (Tr. at 401). She said in addition to herself and her sister, seven children were living in her house. She had been to the emergency room twice and had increased anxiety and insomnia but no increased depression. She also reported being moody and very anxious and said she sleeps for only three to four hours per night. Dr. Burton adjusted plaintiff's medications and added Ambien for sleep.

On November 26, 2007, plaintiff went to Carroll County Memorial Hospital where Jeanne De Motte, M.D., performed x-rays of her lumbar and cervical spine (Tr. at 388-389). The x-ray of her cervical spine revealed degenerative disc disease at C6-7 and a small right C7 cervical rib. The x-ray of her lumbar spine revealed degenerative disc disease worse at the L5-S1 level than L4-5; bilateral pars defect at L5 with secondary grade 1

11

spondylolisthesis[7] of L5 anterior to S1; and minor right curvature of the spine.

On November 29, 2007, Alex Dymek, M.D., referred plaintiff for an orthopedic consultation in light of her unresolved complaints of back and neck pain that she claimed to have had for five years (Tr. at 318).

On December 12, 2007, plaintiff returned to Dr. Dymek's office reporting continued neck and back pain (Tr. at 319). She stated that she had an appointment in Columbia, Missouri, at the Spine Center. Plaintiff reported that ibuprofen and naproxen hurt her stomach; therefore, Dr. Dymek gave her a prescription for Flexeril, a muscle relaxer and Vicodin, a narcotic.

On January 11, 2008, plaintiff returned to Burrell and was examined by Dr. Burton (Tr. at 400). She reported that her moods feel shaky in the morning but her energy and appetite were good and her concentration was better. Plaintiff told Dr. Burton that she was divorcing her husband but that they were "agreeable" and that he was paying child support. She was sleeping well with the Ambien. Dr. Burton reduced her dose of Depakote to 500 mg twice per day and gave her Tegretol.[8]

On January 18, 2008, plaintiff saw Joel Jeffries, M.D., in the orthopedic clinic at Columbia Regional Hospital, upon referral from Dr. Dymek (Tr. at 340-343). Plaintiff complained of a long history of difficulty with her neck and low back that began five years earlier and included "100% neck pain" and associated headaches, along with a slight

---

[7]Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips out of the proper position onto the bone below it.

[8]Tegretol (Carbamazepine) is used to treat episodes of mania (frenzied, abnormally excited or irritated mood) or mixed episodes (symptoms of mania and depression that happen at the same time) in patients with bipolar I disorder. Carbamazepine is in a class of medications called anticonvulsants. It works by reducing abnormal electrical activity in the brain.

12

diminution in her ability to stand or walk. Dr. Jeffries noted that plaintiff had not undergone

any surgery, injections, for formal physical therapy. Upon examination he observed that

plaintiff's gait was normal; she was able to heel walk, toe walk, and perform a single leg stand

without significant difficulty. She had full range of motion in her cervical spine. Examination

of plaintiff's lumbar spine showed normal contour and a moderately diminished range of

motion. Spurling's and Lhermitte's signs[9] were negative. X-rays showed L5 spondylosis with

Grade I spondylolisthesis. Dr. Jeffries diagnosed mechanical neck pain with cervicogenic

headaches and spondylolisthesis at L5-S1 and recommended a home exercise program.

On March 7, 2008, plaintiff saw Dr. Burton and reported that Tegretol made her sick to

her stomach and sedated (Tr. at 399). She reported that her sister was getting evicted and her

husband recently got his third DWI. "He is at her house so he can take her to work.[10] If he

goes to jail she loses everything." Dr. Burton noted that plaintiff's mood was anxious. She

reported sleeping a lot, she said her energy was a little below normal, and her concentration

was poor. Dr. Burton filled plaintiff's prescriptions for Depakote, Xanax, Wellbutrin, Vistaril,[11]

Zantac, and Bentyl.

On March 27, 2008, plaintiff called Burrell and reported that she had an increase in

depressive symptoms on Wellbutrin XL so Dr. Burton authorized a prescription for Wellbutrin

SR 200 mg (Tr. at 399).

---

[9]Spurling's test is used in helping to confirm a diagnosis of cervical radiculopathy. Lhermitte's sign is a sudden, electric-like shock spreading down the body when the patient flexes the head forward, seen in multiple sclerosis and in disorders of the cervical cord.

[10]This was more than a year after plaintiff's alleged onset date. She reported no earnings in 2008.

[11]Vistaril is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions, including motion sickness. It is also used for anxiety and to treat the symptoms of alcohol withdrawal.

13

On April 17, 2008 plaintiff saw Grace Dymek, M.D., for a well-woman exam (Tr. at 304-305). She completed a form in which she reported that the only chronic health problem she had was heart disease and a murmur; that she had no recent hospitalizations; and that she took a number of medications, including Xanax, Wellbutrin, Depakote, Cephalexin, Macrobid, Claritin, and Bentyl.

On May 9, 2008, plaintiff saw Dr. Burton for a follow up (Tr. at 397). She reported that she felt better for a while with the increased dose of Wellbutrin. Her energy was fair and her appetite increased, but her concentration was not great.

On June 3, 2008, plaintiff went to the emergency room at Carroll County Memorial Hospital reporting anxiety and nausea (Tr. at 365-366). Marvin Ross, D.O., examined plaintiff and noted she was on multiple medications including Wellbutrin, Xanax, Vistaril, Depakote, Phenergan,[12] Bentyl[13] and Prevacid.[14] Plaintiff stated that she had not eaten anything and was unable to throw up. Dr. Ross examined plaintiff and found that she was alert, oriented, and answered questions appropriately. Her ears, eyes, nose, and throat were "totally within normal limits." Plaintiff was given IV hydration and medication for nausea and pain. Less than two hours after she had arrived, plaintiff denied any ongoing pain or anxiety and left the hospital.

---

[12]Phenergan is used to relieve the symptoms of allergic reactions such as allergic rhinitis (runny nose and watery eyes caused by allergy to pollen, mold or dust), allergic conjunctivitis (red, watery eyes caused by allergies), allergic skin reactions, and allergic reactions to blood or plasma products. Phenergan is used with other medications to treat anaphylaxis (sudden, severe allergic reactions) and the symptoms of the common cold such as sneezing, cough, and runny nose. Phenergan is also used to relax and sedate patients before and after surgery, during labor, and at other times. Phenergan is also used to prevent and control nausea and vomiting that may occur after surgery, and with other medications to help relieve pain after surgery. Phenergan is also used to prevent and treat motion sickness.

[13]Treats irritable bowel syndrome.

[14]Reduces stomach acid.

14

Dr. Ross noted that plaintiff "should do well" and told her to follow up with Dr. Dymek the following day.

On June 5, 2008, plaintiff reported to Dr. Dymek's office to follow up on her ER visit (Tr. at 298). Dr. Dymek increased her Xanax to 1 mg.

On June 27, 2008, plaintiff saw Dr. Burton and claimed she lost everything in a flood two days earlier and did not know when she could return to her home (Tr. at 396). She reported a lot of panic attacks and hyperventilating, great energy but poor concentration. Dr. Burton diagnosed bipolar disorder, hypomania (see footnote 6 on page 8), and panic disorder. She increased plaintiff's dosage of Depoke and prescribed Wellbutrin and Xanax.

On August 7, 2008, plaintiff reported to the ER at Carroll County Memorial Hospital reporting an anxiety attack and an inability to swallow her Xanax (Tr. at 362-363). Dr. Dymek examined her and noted that her vital signs were stable but she was hyperventilating. Dr. Dymek assessed her with an overwhelming anxiety attack and gave her 2 mg of Ativan.[15] Plaintiff had arrived at 8:29 p.m., by 9:20 she denied anxiety, and at 9:22 she left the ER with a friend.

On September 29, 2008, plaintiff returned to the ER at Carroll County Memorial Hospital reporting anxiety and confusion (Tr. at 360-361). She stated that she had been having nausea and vomiting for three days along with dysphagia[16] and anxiety attacks. Plaintiff said she feels foggy and slow when people talk to her. She also reported tingling over her whole body and shaky hands. Plaintiff said she "had a lot of problems going on with her

---

[15]Ativan (Lorazepam) is used to relieve anxiety. Lorazepam is in a class of medications called benzodiazepines. It works by slowing activity in the brain to allow for relaxation.

[16]Dysphasia is a partial or complete impairment of the ability to communicate resulting from brain injury.

15

family at this time and just slowly began to have difficulty and just couldn't get it under control with her normal medication she takes on a regular basis, so she came into the emergency room." Dr. Ross examined her and noted that she "appears to be having a severe anxiety attack." Dr. Ross gave her 1 mg of Ativan for her anxiety and some Compazine for nausea.

On October 14, October 24, November 25, and December 9, 2008, plaintiff saw Dr. Dymek for a flu shot and complaints of a sore throat, congestion and constipation (Tr. at 288-289, 291-293). The treatment records do not reference any issues with panic, anxiety, confusion, or inability to swallow. During the December 9 visit, plaintiff said that she had fallen on the bathroom floor. Dr. Dymek diagnosed her with panic attacks, abdominal bloating and gastro-esophageal reflux disease ("GERD").

On December 22, 2008, plaintiff was seen by Melissa Hutchens, M.D., a resident psychiatrist who worked with Dr. Burton at Burrell (Tr. at 395). She reported extreme anxiety and inability to sleep. Plaintiff had stopped taking Lamictal due to nausea and vomiting. She stated that she recently had memories of her sister being abused and she had a lot of guilt over that. She also stated that she had "lots of memory gaps from 3-7." Dr. Hutchens thought plaintiff might have been destabilized by steroid medications prescribed for sinusitis and expected improvement as the dosage tapered. She added Seroquel[17] to plaintiff's medications and told her to return in a month.

On January 11, 2009, plaintiff returned to the ER at Carroll County Memorial Hospital stating that she was having an anxiety attack and was vomiting (Tr. at 355-356). Dr. Ross found that plaintiff's physical signs were normal and she did not appear to be in any acute

---

[17]Treats the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions).

16

distress. He treated her with IV hydration as well as 4 mg of Zofran for nausea and 1 mg of Ativan.

On January 12, 2009, plaintiff called Burrell and reported that she was in the ER the night before for "ENT problems," trouble swallowing, nausea, and vomiting (Tr. at 394). She stated that she was now having panic attacks because of her inability to swallow. Seroquel, prescribed the night before, was only helping her a little. Dr. Hutchens told plaintiff she could use up to 5 mg of Xanax in a 24-hour period.

On February 9, 2009, plaintiff called Burrell to cancel her appointment with Dr. Hutchens (Tr. at 393). This was the second cancellation in a row. Plaintiff reported that she had refills of all her medications available.

The following day, February 10, 2009, plaintiff went to the hospital reporting an episode of fainting accompanied by radiating chest pain (Tr. at 350). A chest x-ray was normal (Tr. at 353). The day after, plaintiff saw George Pogson, III, M.D., in the cardiology clinic at CCMH (Tr. t 351). Aside from slightly elevated blood pressure, a physical examination was normal. Dr. Pogson found that coronary disease seemed "rather unlikely" but ordered a stress test and echocardiogram to be sure. Both were normal (Tr. at 346-348, 351).

On March 23, 2009, plaintiff saw Dr. Hutchens and reported that she was "not doing too great" (Tr. at 392). Plaintiff reported extreme anxiety and said she had a recent episode she thought was a heart attack. "Denies any prior anxiety symptoms." She said her "ex had to move in so her BF [boyfriend] moved out." Plaintiff's husband had alcohol issues and was pushing to get back together. Plaintiff said she felt she had no control. Plaintiff said she was only using Seroquel (treats schizophrenia) twice a week for sleep and was using Vistaril (treats nausea, anxiety and itching) regularly. Dr. Hutchens diagnosed bipolar disorder, panic

17

disorder, and depression and adjusted plaintiff's medications, prescribing Cymbalta to replace Wellbutrin.

On April 27, 2009, plaintiff was seen at Burrell and told Dr. Burton that Cymbalta was working really well and was helping to stop her depression and lessen her anxiety (Tr. at 391). She reported recent mania, a racing mind, little sleep, and increased stress due to a meeting the next morning with the disability lawyers. Dr. Hutchens told plaintiff she could take additional Depakote and Seroquel for a few days if needed, and then return to the previous dosage as her stress subsided.

On June 8, 2009, plaintiff returned to Burrell and reported to Dr. Burton that she was using videos and cards/skills to handle panic and anxiety (Tr. at 390). She said she had reduced her use of anti-anxiety medication, had a few "major episodes" with moving her boyfriend in and husband out, but no visits to the hospital, and she had improved her diet and was exercising regularly. Dr. Hutchens noted that plaintiff was euthymic (a relatively stable mood state), active, and doing better with skills. She instructed plaintiff to return in two to three months.

On September 22, 2009, plaintiff saw Jane Rued, Ph.D., at the request of Disability Determinations (Tr. at 413-420).

> Mrs. Constant is a 29 year old, married female who is currently separated from her husband. She reports having four children aged 4, 6, 9, and 11. She had a photo ID, a Missouri Driver's license.

> Mrs. Constant reports having a GED. She said she attended school through eleventh grade, leaving when she was pregnant with her first child. She said she had no special education services. In work history, she said she has mostly worked at a restaurant in Carrollton, 10 to 12 years off and on. She explained that they are family friends so that she and her sister work there on and off. She said she also worked in housekeeping at Super 8, leaving employment there in about 2002. She said she left because she was having too much trouble working there with her back and with her anxiety. She said she also worked at Hallmark two different times, the last time she left there was probably around 2006. She said she left because of her anxiety, not being

18

able to stay there the whole day. She said that also the work setting put a lot of strain on her back. She said that after Hallmark she returned to work at the restaurant where she had worked before, the Burger Bar. She said that she worked there as long as she could but at that time her stomach was in way worse condition than it is now. She said that her doctor explained that smelling the food made acid production increase in her stomach, causing her problems. She said [she] left there about three years ago, probably in 2007. She said that was her last employment.

Mrs. Constant said she has been hospitalized twice with anxiety attacks, having been picked up by the ambulance from her home. She said additionally, she has gone to the Emergency Room four to six times on her own for anxiety. She said she had her gall bladder removed last year but that is now an outpatient procedure. She said Dr. Grace Dymek is her family doctor. She said Dr. Dymek has diagnosed her with IBS [irritable bowel syndrome], ulcers, and chronic sinusitis. She said also sees a specialist for her sinuses but does not recall that doctor's name. She said that Dr. Albert Shaw, a psychiatrist, sees her over a television connection at Burrell Health Services in Carrollton. She said it is called Tele Net and he is actually located in Columbia. She said that Dr. Shaw's diagnosis for is bipolar, anxiety disorder, phobia disorder, and obsessive compulsive disorder. She said she has seen a counselor, Christy Duren, also through Burrell for the past eight to nine months. She said she had a different counselor before and they kind of switch out. She said the counselors don't give her diagnosis, going with what the doctor has said. She said she sees her therapist once a week and Dr. Shaw every other month. She added degenerative disc disease to the diagnosis given to her by Dr. Dymek. Medications which she reports taking and brought with her are as follows: Cymbalta 30 mg., Alprazolam 1 mg. 5 x, Vistaril 25 mg qid [four times a day] prn [as needed], Seroquel 300 mg 1 or 2 hs [at bedtime], Lithium 300 mg 2 hs, Prevacid 30 mg., Flexeril 10 mg prn, Alavert D ‑12 hr.

Mrs. Constant came to the evaluation attractively groomed and dressed with piercings evident by earrings and at her right eyebrow. She was able to express her thoughts adequately through speech with affect appropriate to thought, and had a pleasant, cooperative manner. Short term auditory memory was low within the average range as she was capable of recalling a number of five digits in length. She completed the first five subtractions of serial sevens within 28 seconds with one error in computation, and completed the entire series within 120 seconds with an additional error. Abstract thought, as suggested by her capacity to explain the meaning of three proverbs, appeared marginal. She was able to explain the point of two of the three offered.

Clinic notes from the University of Missouri Healthcare are available for visits between the dates of 1‑18‑2008 and 12‑15‑2008. On 1‑18‑2008 Joel T. Jeffries, M.D., of the Orthopedic Clinic gave the impression of: 1. Mechanical neck pain, with cervicogenic headaches, 2. Spondylolytic, Spondylolisthesis L5, S1. He indicated that he had started her on a home exercise program to do twice a day and if she continues to have significant complaints of low back pain, they would consider a magnetic resonance imaging of her lumbar spine. He noted that her past medical history included depression, tobacco abuse, gastric reflux, anemia, migraines, ulcers, anxiety,

Case 4:11-cv-00455-REL   Document 13   Filed 07/06/12   Page 19 of 37

panic disorder and bipolar disorder. Also on 1-18-2008 Minh-Tri Dang, M.D., wrote a report of the lumbosacral spine series with history of L5-S1 degenerative changes. The impression was of L5 spondylosis, with a grade 1 spondylolisthesis.

* * * * *

On 12-23-2008 David Chang, M.D., of the Otolaryngology Clinic wrote a clinic note. The impression was of chronic sinusitis. In addendum, it was noted that ICAP was positive for dust mites (both types). He counseled the patient to stay on nasal steroid. It was noted that the patient was now on Seroquel by psychiatrist to counteract auditory hallucinations contributed by the prednisone. On February 5, 2007 Angela Lukebeart Guest, QMHP, wrote a report of an assessment which was also signed by a physician G. Burton on 3-16-07. It was noted that around the first of January, 2007, the client could not sleep, and she heard radio, radio announcer and there was no radio playing. One time occurrence. Client stated that she was exhausted and really depressed. The DSM-IV code given was: Axis I: 300.01 Panic D/O, 300.3 OCD [obsessive compulsive disorder], 296.8 Bipolar NOS, Axis II: None, Axis III: Stomach Ulcer, Heart Murmur - No Problems, on Axis IV the problems were various areas was graded on 1, 2, or 3 for each area, Axis V gave a GAF of 51. The consensus was that the client's anxiety, panic, and stress cause difficulty in functioning. The client has decreased work to three days per week b/c [because] of this. Client also has germ phobia. Several weeks of increased of mood and then several of decreased mood. It was recommended that she obtain CPRC-R services to learn coping skills and stress reduction. Recommended program for following: Go to LPN School, Saline Co Vo Tech, Marshall, get anxiety under control - C5, cope with germ phobia, reduce stress to help reduce stomach nausea/pain.

An Individual Treatment and Rehabilitation Plan was written on February 26, 2007 by Angela Lukeheart Guest. The diagnosis given was: Axis I: Panic D/O 300.01, OCD 300.3, Bipolar NOS [not otherwise specified] 296.8, Axis II: None, Axis III: Stomach Ulcer, Heart Murmur, Axis IV: Stressors: Economic, Social, Job, Axis V: GAF 51. Agencies providing service included DFS for food stamps and children, Medicaid, and Burrell Behavioral Health by Angela Guest for CPRC, beginning 2-07. Progress notes, indicative of regular treatment, are available between the dates of 8-3-2007 and 6-8-2009 from Burrell Behavioral Health Central Region. The assessment on 8-3-2007 was Bipolar -Type 1- Euthymic to mildly depressed, GERD, GI distress, try (?). The diagnosis given on 6-8-2009 was: 1. Bipolar D/O I, Euthymic, Panic D/O, 3. IBS, DJD [degenerative joint disease] back pain. It was recommended that she continue the meds as is including Cymbalta 60, Xanax 1 mg., Depakote ER, 1000, Seroquel 50, Vistaril 25 prn [as needed].

Asked to describe her current mood, Mrs. Constant said that it is very volatile because her bipolar diagnosis indicates her being either manic or depressed, and she is rapid cycling. She said lately, in the daytime she's been very happy and smiling, and in the evening she has been depressed and crying, irritable. She said a couple of days ago they did a medicine change and she was not certain if that would affect this pattern. She said she gets about four or five hours of sleep a night She said that she hears radio hallucinations which disturb her sleep, with the impression of stereo. She said the radio is usually an old time program and she will hear an announcer and the first part of a

20

song until they get to the verse, then she will get up and check on the kids and look for a radio. She said when she first heard it, she was freaking out, but now that she knows what it is, it's a little bit easier. She said she has been hearing that for well over a year, probably a year and a half, and it is not a constant thing, appearing to depend on how hard a day she had. In regard to her eating, she said she usually has one full meal a day. She said before she started this rapid cycling she was eating pretty normal but now, with rapid cycling and anxiety, she does not. She said she has anxiety attacks with sweating, nausea She eats best in the evening when she takes her medication as she is supposed to eat with it. She denied suicidal ideation but says she does cry at times. She said she has euphoric moods with grandiosity and the ability to go for days without sleep. She said she experiences racing thoughts. She said she does have mood swings, more frequently recently. She wondered if it might be due to the stress of working out a divorce with her husband from whom she has been separated for three years. She acknowledged having panic attacks, saying usually she will start with a panic attack and it will turn into full blown anxiety.  She said she doesn't know what she feels anxious about but her heart will start to race, her breathing gets fast and she will usually have to go outside. However, she says she has a program which she bought on CDs from a TV ad which she has been using and she has not had to go the emergency room since doing so. She said she can convince herself that she is not going to die or have a heart attack and usually can keep herself at home. She said the panic and anxiety usually occurs a couple of times a week. She said she does . . . feel able to go places as long as she doesn't have panic or anxiety. She said she still does not drive due to concern that she may have a panic attack when doing so. She said that other than that, she can go to the kids' events and activities, to the store and to the bank. Asked about her report of having a phobia, she said that she has severe fear of snakes, vomiting, germs, and hospitals. She said if someone is sick she won't go around them unless it is her child. She said also, she doesn't touch faucets or door knobs unless she has to using a paper towel. She said she provides hand sanitizer for the children.  She described her family history as including schizophrenia, bipolar disorder, and anxiety disorder, particularly on her father's side.

Mrs. Constant said that she and her sister have both been sexually abused, with her sister actually raped and herself being molested. She said the perpetrator was an uncle and she was seven years old when this occurred. She said she has flashbacks of this. Asked if there were things she avoided due to those events, she said she avoided family on that side of the family.

Mrs. Constant said that she does not drink at all. She said that years ago, she went off and on with her sister to the bar in town but doesn't do so any longer. She said that if she drinks, her ulcers act up real bad. She denied street drug usage but said probably when she was 15 years old or so she smoked pot off and on. She said she has no experience with legal problems.

Mrs. Constant says she has a driver's license. She believes herself capable of caring for her personal needs. She said she has a checkbook and thinks she is able to manage her funds. She said that her four children live with her. She said she is able to keep up the house and her children are very helpful in that regard. She said they take

21

care of their own rooms and what they get out, they pick up. She said her sister lives nearby and when she's having a rough time, her sister will come over and they will have dinner together or vice or versa. She said she will go over to her sister's when she is having a rough time and they are each other's support.

Describing a typical day, Mrs. Constant said that on a normal day, they are up at around six o'clock as the bus comes at seven. She said the kids get ready [for] school, usually having cereal before they leave. She said that her son's preschool only lasts until 10:30 and the bus brings him back. She said then they will have lunch, take their showers and such and at 3:30 the other kids come borne. She said the kids do their homework and dinner is at 6:00. She said she puts the children to bed at around 8:00. She said that for fun, she will take the kids and go anywhere. She said they do camping and such in the summertime, usually at Van Meter's State Park. She said also, the kids participate in sports. She said she will usually sit out and read a book, watching them play on their trampoline. She says she reads a lot and writes a lot, and may play catch with the kids.

On the Minnesota Multi-Phasic Personality Inventory -II (MMPI-II), Mrs. Constant had a validity constellation of a caret with an elevated F scale at TSO, indicating that she did not appear to defensively deny having human faults and weaknesses and was willing to indicate her shortcomings. It was a strong "fake bad" response set of exaggeration and distortion of problems, limiting the validity of the test findings. Such a profile may be found in an individual who is a malingerer or also with one who is trying to a raise a red flag of their need for help. There was an elevation of the neurotic triad which is a profile of an individual like[ly] to perceive themselves [sic] as physically ill. They may represent the displacement of psychic conflicts into the somatic domain. The profile was also consistent with an individual with obsessive compulsive thoughts, with anxiety as well as ruminative and ambivalent thinking. Excessive endorsement of negative characteristics leads to potential for multiple possible diagnoses including fictious disorder[18] with physical symptoms, brief psychotic disorder, schizophrenia, major depression with psychotic features, and bipolar affective disorder II.

During evaluation, Mrs. Constant demonstrated the ability to understand and remember instructions and to sustain concentration and persistence in short tasks. She appears capable of interacting socially and in that way adapting to her environment. However, she reports a history of withdrawing from a work setting due to anxiety at times and also to physical problems with her back at other times. Her reported history and description of current functioning is consistent with bipolar disorder. While she reports panic attacks, she states that she does feel able to go places.

Diagnostic impression is: Axis I: 296.7 Bipolar Disorder, 300.21 Panic Disorder without Agoraphobia, Axis II: V71.09 No Diagnosis, Axis III: Stomach Ulcer, Heart

---

[18]I have been unable to find any definition for a "fictious disorder."

Murmur, Sinusitis, IBS, Degenerative Disc Disease, Axis IV: Occupational Problems, Financial Problems, Axis V: 51.

Dr. Rued found that plaintiff has mild limitation in her ability to interact appropriately with the public and moderate difficulty interacting appropriately with supervisors and co-workers (Tr. at 419). She was moderately limited in her ability to respond appropriately to usual work situations and to changes in a routine work setting.

Plaintiff submitted additional evidence to the Appeals Council only (Tr. at 5, 425-430). On September 2, 2010, more than a year after the administrative hearing, Dr. Burton completed a Mental Medical Source Statement in which she stated that she had seen plaintiff approximately every two to three months for three years (Tr. at 425). She diagnosed bipolar disorder and panic disorder, treated with mood stabilizers, antidepressants and anti-panic medications; and assigned a current GAF of 45,[19] noting that plaintiff's highest GAF in the past year was 55. She checked boxes on the form to indicate that plaintiff had appetite disturbance, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, psychomotor agitation or retardation, social withdrawal or isolation, decreased energy, manic syndrome, feelings of worthlessness, and difficulty thinking or concentrating. Dr. Burton found that plaintiff's mental abilities and aptitude to do unskilled work were fair, and on average her impairments would cause her to be absent from work about once a month.

## C.    SUMMARY OF TESTIMONY

During the July 23, 2009, hearing, plaintiff testified; and Denise Waddell, a vocational expert, testified at the request of the ALJ. At the conclusion of the hearing, the ALJ ordered the psychological evaluation that was done by Dr. Rued (Tr. at 49).

---

[19]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

1.   **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 29 years of age, married but separated and had four children, ages 11, 10, 7 and 4 (Tr. at 29). The children live with plaintiff (Tr. at 29). Plaintiff left high school in 11th grade but shortly thereafter earned a GED (Tr. at 30). Plaintiff has a driver's license and drives "most of the time" (Tr. at 30).

Plaintiff and her husband have been separated for two and a half years (Tr. at 42). They remain good friends, and he helps her out and helps with the children (Tr. at 42).

Plaintiff's alleged onset date is February 8, 2007, which is the date she "finally completely stopped working at all" due to anxiety (Tr. at 30). Plaintiff previously worked in housekeeping at a Super 8, she worked at The Burger Bar, and she had other short-term jobs (Tr. at 30-31). Plaintiff's highest earnings year was 2006 when she made approximately $5,100 (Tr. at 31). Plaintiff has never held a job more than 30 days except the Burger Bar, and she has worked there off and on since she was 15 (Tr. at 31-32). The people who own it are family friends and keep letting her and her sister come back to work (Tr. at 32).

Plaintiff was taking Vistaril, Xanax, Cymbalta, Depakote, Seroquel, Prevacid, Bentyl, and Flexeril (Tr. at 32). Her medications help with the anxiety, but "not enough" (Tr. at 37). Her medications make her drowsy and nauseous, they give her headaches and cause her to be confused and to stutter (Tr. at 32). Plaintiff has panic attacks caused by nothing, or it could be going grocery shopping, going into public, going into an unsanitary area (Tr. at 32). Plaintiff sees a doctor once every month or two for medication management; she sees a counselor every week (Tr. at 32). The counseling has helped with the bipolar disorder but not with the anxiety (Tr. at 33). Plaintiff went to the hospital four times in 2008 for anxiety, but she cannot identify anything in 2008 that made her anxiety worse (Tr. at 33).

24

On a typical day, plaintiff wakes up at 6:30, gets the three older kids ready for school and on the bus (although they eat breakfast at school), then she and her youngest son pick up things around the house, watch television, or go visit with her sister until the kids come home from school (Tr. at 34). Plaintiff's oldest son has ADHD and bipolar disorder[20] so she has her "hands full" trying to help him with homework and getting "stuff done" until her kids go to bed around 8:00 (Tr. at 34). Plaintiff goes to bed around 11:00 p.m., but she only sleeps four or five hours a night (Tr. at 34).

On a normal day, plaintiff does the grocery shopping (Tr. at 34). If she is having anxiety, she sends her 11-year-old and her 10-year-old into the store to buy items for her (Tr. at 34). If she is in the store and has anxiety, she either leaves (if she is alone) or has her children finish the shopping for her (Tr. at 34).

Plaintiff's anxiety attacks begin with racing heart and chest pain, and she has a tingling in her spine (Tr. at 35). Her hands sweat, she gets nauseous to the point of vomiting, she feels doom and has a need to go outdoors (Tr. at 35). The anxiety attacks last a couple hours to a couple days (Tr. at 35, 37). If plaintiff's chest pain is bad or if she cannot stop the nausea and vomiting, then she goes to the hospital (Tr. at 35-36). When she has a panic attack she has to be told what to do and her blood pressure gets out of control (Tr. at 38). After a panic attack, plaintiff feels sluggish and tired and has to lie down because it is mentally exhausting (Tr. at 37). Plaintiff has suffered from panic attacks since she was 17 years old (Tr. at 36). Her most recent one was the week of the administrative hearing (Tr. at 42). It was a bad one, and she probably should have gone to the hospital because her face was numb and her fingers and legs

---

[20]According to plaintiff's motion to proceed in forma pauperis, she receives $560 per month from Social Security for her son.

were tingling (Tr. at 42).  During a bad period of anxiety, plaintiff will get up and do the kids'

laundry and feed them and try to help them with homework while she is in bed (Tr. at 43).

Plaintiff's employment has suffered due to anxiety because she has to call in on days

when her anxiety is bad, or she has to leave work when she has a panic attack (Tr. at 36).  The

Burger Bar is "one of the busiest restaurants [in Carrollton] and you can't just walk out during

those times.  They don't have anybody to cover you." (Tr. at 36).

Despite her testimony about shopping alone or with her children, plaintiff later testified

that she does not drive alone at all, "usually, without another adult with me" because she does

not know when she will have an anxiety attack (Tr. at 36).  She never drives more than 30

miles (Tr. at 36).  In order to get to the hearing, plaintiff and her estranged husband drove

together, with her driving part of the way and him driving the other part (Tr. at 37).

Plaintiff has also been diagnosed with bipolar disorder (Tr. at 39).  When she is in a

manic phase, it makes her anxiety much worse (Tr. at 39).  The mania is mostly during the

summer, maybe once or twice a month, and lasts three or four days (Tr. at 39).  When plaintiff

is having a manic episode or anxiety attack, she gets help with her children from her sister, her

parents, or her husband (Tr. at 40).  Despite her anxiety, she is able to get her three oldest kids

off to school "because it has to be done" and then she and her youngest son can lie down and

relax and she gets him breakfast while he watches television (Tr. at 40-41).  Plaintiff has read

a lot of books on anxiety and that has taught her how to focus so she can do "necessary things"

(Tr. at 41).

Plaintiff goes through periods of depression in the winter (Tr. at 41).  She has crying

episodes when she is not doing a lot, and her head thinks she is tired when she really is not (Tr.

at 41).  She has a depressive episode once a week in the winter which lasts sometimes up to a

day (Tr. at 41).

Plaintiff's children have chores in their bedrooms (Tr. at 42). If plaintiff is "down for a couple days" her sister will come and help her (Tr. at 42). Plaintiff does the same thing for her sister when her sister is sick (Tr. at 42).

Plaintiff has a phobia about germs (Tr. at 43). She repeatedly cleans her bathroom and she will not touch tables and chairs (Tr. at 43). In public places she uses a paper towel to open bathroom doors (Tr. at 44). When she worked at the Burger Bar, she did not like to touch the trays because she knew people had handled them (Tr. at 44).

Plaintiff's anxiety causes her to have ulcers and irritable bowel syndrome (Tr. at 44). She may be OK one day but the next day she will have to worry about diarrhea all day (Tr. at 45).

2.    **Vocational expert testimony.**

Vocational expert Denise Waddell testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could sit, stand or walk six hours each; could lift ten pounds frequently and twenty pounds occasionally; should never climb ladders, ropes or scaffolds or be exposed to vibration, dangerous machinery or unprotected heights; can occasionally climb stairs or tramps and stoop. The person should never be expected to understand, remember, or carry out detailed instructions; job duties should be simple, repetitive, and routine in nature; can occasionally have contact with supervisors and co-workers but should never have any job duties requiring public contact, although incidental contact is acceptable (Tr. at 47-48). The vocational expert testified that such a person could work as a collator operator, DOT 208.685-010, with 1,100 in Missouri and 36,000 in the country; an inserting machine operator, DOT 208,685-018, with 1,300 in Missouri and

43,000 in the nation; or an electrical assembler, DOT 729.684-054, with 2,400 in Missouri and 55,000 in the country (Tr. at 48).

The second hypothetical was the same as the first except the person would miss two or three days of work per month (Tr. at 48). The vocational expert testified that such a person could not work (Tr. at 48).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Christine Cooke entered her opinion on January 29, 2010 (Tr. at 11-18). She found that plaintiff meets the insured status requirements of the Social Security Act through June 30, 2007 (Tr. at 13).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 13).

Step two. Plaintiff suffers from degenerative disc disease, bipolar disorder, and anxiety disorder, which are severe impairments (Tr. at 13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four. Plaintiff retains the residual functional capacity to sit, stand, or walk for six hours each. She can lift ten pounds frequently and 20 pounds occasionally. She should never climb ladders, ropes, or scaffolds, but she can occasionally climb stairs or ramps and can occasionally stoop. She should never be exposed to vibration and should never be exposed to hazards such as dangerous machinery or unprotected heights. Plaintiff should never be expected to understand, remember, or carry out detailed instructions. Her job duties should be simple, repetitive, and routine in nature. She should never have job duties which require public contact, although incidental contact would be acceptable. She can have up to occasional contact with supervisors and with co-workers (Tr. at 15). Plaintiff has no past relevant work (Tr. at 17).

28

Step five.  Plaintiff was 26 years old at the time of her alleged onset date, she has at least a high school education, and can make an adjustment to work available in significant numbers in the economy, such as collator operator, with 1,100 jobs in Missouri and 36,000 in the nation, or inserting machine operator, with 1,300 jobs in Missouri and 43,000 in the nation, or electrical assembler, with 2,400 jobs in Missouri and 55,000 in the nation (Tr. at 17-18).  Therefore plaintiff was found not disabled at step five of the sequential analysis (Tr. at 18).

## VI.    *NEW EVIDENCE BEFORE APPEALS COUNCIL*

Plaintiff argues that the Appeals Council erred by failing to consider the Medical Source Statement provided by plaintiff's treating psychiatrist, Dr. Glenna Burton on September 2, 2010.

"If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b).  Further, "[t]he Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision." Id.

"In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000) (citing Jenkins v. Apfel, 196 F.3d 922, 924 (8th Cir.1999) (citing Riley v. Shalala, 18 F.3d 619, 622 (8th Cir.1994)).  In these situations it is the role of the court "to determine whether the ALJ's decision 'is supported by substantial evidence on the record as whole, including the new evidence submitted after the determination was made.'" Id. (quoting Riley v. Shalala, 18 F.3d at

29

622).  The district court is required to "decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." Id.

"The Appeals Council <u>must</u> consider evidence submitted with a request for review if it is '(a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Id. (emphasis in original) (quoting <u>Box v. Shalala</u>, 52 F.3d 168, 171 (8th Cir. 1995) (quoting <u>Williams v. Sullivan</u>, 905 F.2d 214, 216-17 (8th Cir. 1990)).  The issue of whether additional evidence meets these criteria is a question of law and is reviewed de novo. <u>Id</u>.  The Eighth Circuit has interpreted "the Appeals Council's statement that the additional evidence did not provide a basis for changing the ALJ's decision as a finding that [the additional evidence is] not material."[21] <u>Aulston v. Astrue</u>, 277 Fed. Appx. 663, 664 (8th Cir. 2008) (citing <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1069-1070 (8th Cir. 2000)).

In <u>Bergmann</u>, the claimant submitted additional evidence to the Appeals Council consisting of letters from her treating psychiatrist "discussing her mental condition and opining that she would be disabled for twelve months or longer and likely could not maintain gainful employment for the next two years." <u>Bergmann v. Apfel</u>, 207 F.3d at 1067.  The Appeals Council denied the request for review stating that it considered the additional evidence, but failed to expound upon that statement. <u>Id</u>.  It concluded that "neither the contentions nor the additional evidence provides [sic] a basis for changing the Administrative Law Judge's decision." <u>Id</u>.

---

[21]I note that in plaintiff's brief, she accurately states the law on this point; however, in her argument section, she states that the court would interpret such a statement as not considering the statement at all, which is completely different.  See plaintiff's brief at page 20: "However, as in <u>Aulston</u>, the Appeals Council merely stated that the new 'information does not provide a basis for changing the [ALJ's] decision.' (Tr. 2); <u>Aulston</u>, 277 Fed. Appx. at 664. The Eighth Circuit interprets this statement to mean that **the Appeals Council did not consider the additional evidence**. <u>Id</u>." (emphasis added).

30

The Medical Source Statement provided by Dr. Burton is dated September 2, 2010 -- the ALJ's decision was rendered on January 29, 2010. Dr. Burton states that she has been seeing defendant for the past three years approximately every two to three months. She provided her diagnosis of bipolar disorder and panic disorder, both of which were diagnosed in the records before the ALJ. The "new" part of this Medical Source Statement is an indication that her current GAF is 45 whereas in all of the medical records prior to the ALJ's decision plaintiff's GAF was in the 50s or 60s. However, this is not something the Appeals Council could consider because it is at most evidence of post-decision deterioration of a pre-existing condition, which the Appeals Council is not to consider. The remainder of the Medical Source Statement is merely cumulative to the medical records that were before the ALJ with the exception of the opinion that plaintiff may be absent from work about one day per month due to her condition or treatment. However, when taken in context with the rest of the record, it does not amount to new and material evidence.

Dr. Burton found that plaintiff has a "fair" ability to perform all 20 features of unskilled work:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

Case 4:11-cv-00455-REL   Document 13   Filed 07/06/12   Page 31 of 37

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

But more importantly, Dr. Burton stated right on this Medical Source Statement that there have been no substantive changes to plaintiff's condition in the past three to four years (Tr. at 430). The ALJ had all of plaintiff's mental health records from the past three to four years and was able to determine from those records that plaintiff's mental impairment did not restrict her from performing substantial gainful activity. This is in accordance with Dr. Burton's findings that plaintiff has a fair ability to perform all of the mental tasks of unskilled work, including interacting appropriately with the general public, co-workers and supervisors (which is less restrictive than the ALJ's residual functional capacity assessment) and understanding, remembering and carrying out detailed instructions (which is less restrictive than the ALJ's

residual functional capacity assessment).  The checked box indicating that plaintiff would miss work about one day a month does not, when considered in context with the rest of the document, make this document new and material evidence.

## VII.    *RESIDUAL FUNCTION CAPACITY/ FULLY DEVELOPING THE RECORD*

Plaintiff argues that the ALJ's residual functional capacity assessment was deficient because it was not based on medical evidence regarding plaintiff's physical limitations and because the ALJ failed to order additional medical information required to develop the record. Contrary to plaintiff's argument, the ALJ properly assessed plaintiff's residual functional capacity based on all of the relevant evidence of record and had no duty to further develop the record.

Social Security Ruling 96-8p requires that, after identifying an individual's functional limitations, his work-related abilities must be assessed on a function-by-function basis, including physical, mental, and other limitations.  Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004).  The residual functional capacity is the most a claimant can do despite the combined effect of all credible limitations.  20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1).  It is a claimant's burden to prove his residual functional capacity.  20 C.F.R. §§ 404.1545(a)(3), 404.1512(c), 416.912(c), and 416.945(a)(3); Harris v. Barnhart, 356 F.3d 926, 929-30 (8th Cir. 2004).

The ALJ found that plaintiff retained the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk for six of eight hours; never climb ladders, ropes, or scaffolds; occasionally climb stairs or ramps; occasionally stoop; and never be exposed to vibration or hazards such as dangerous machinery or unprotected heights.  The ALJ found that plaintiff's mental impairments caused mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining

33

concentration, persistence, or pace; and no episodes of decompensation. Accordingly, the ALJ included limitations in the residual functional capacity that plaintiff should never be expected to understand, remember, or carry out detailed instructions. Her job duties should be simple, repetitive, and routine, and not require public contact, although incidental contact with the public and occasional contact with supervisors and coworkers would be acceptable.

Plaintiff argues that the residual functional capacity must include a "a narrative discussion" explaining how the evidence supports each conclusion, citing specific medial facts and non-medical evidence. SSR 96-8p does not require the ALJ to state each relevant residual functional capacity finding immediately followed or preceded by a redundant discussion of the evidence supporting that finding. The ALJ discussed relevant evidence before and after enumerating the residual functional capacity.

The ALJ's decision, taken as a whole, includes discussion of the specific medical facts and non-medical evidence supporting the ALJ's residual functional capacity determination and fully complies with SSR 96-8p and Agency regulations.

Plaintiff argues that the ALJ failed to derive a proper residual functional capacity because the record did not contain any medical opinions related to plaintiff's ability to function physically in the workplace. Relying on Gulliams v. Barnhart, 393 F.3d 798 (8th Cir. 2005), plaintiff states that the ALJ must have some medical evidence to support her conclusion. Contrary to plaintiff's argument, the residual functional capacity assessment is based on all relevant evidence, not just medical evidence. 20 C.F.R.§§ 404.1545 and 416.945. Although the residual functional capacity formulation is a part of the medical portion of a disability adjudication (as opposed to the vocational portion), it is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather an ALJ has the duty to formulate residual functional capacity based on all the relevant, credible evidence of records. Cox v. Astrue, 495

34

F.3d 614, 619 (8th Cir. 2007) ("[I]n evaluating a claimant's RFC an ALJ is not limited to considering medical evidence exclusively") (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)); Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that RFC may be proved only by medical evidence, we disagree").

In any event, the evidence of record does not warrant physical limitations beyond those included in the residual functional capacity. X-rays showed only "early degenerative disc disease" and "mild" narrowing, and physical examinations were generally normal, showing that plaintiff had a normal gait and motor strength and a wide range of motion. No doctors suggested that plaintiff limit her physical activities in any way, and in fact, an orthopedist encouraged physical activity and home exercise. Plaintiff's reports that she cleaned house for hours at a time, went camping, exercised, played catch with her children, and often took walks to help control her anxiety further confirm that she did not have physical limitations beyond those accounted for in the residual functional capacity.

Plaintiff also argues that the ALJ failed to properly develop the record regarding plaintiff's physical capacity. However, the duty to develop the record arises when a "crucial issue is undeveloped" and the evidence is not sufficient to allow the ALJ to form an opinion. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). There is no indication in this case that the ALJ was confused by the evidence or was unable to make a residual functional capacity assessment. Tellez v. Barnhart, 403 F.3d 953, 956-57 (8th Cir. 2005) ("there is no indication that the ALJ felt unable to make the assessment he did and his conclusion is supported by substantial evidence.")

Plaintiff argues that the record was not properly developed because the only opinion regarding plaintiff's physical impairments was from "a DDS non-medical Single Decision Maker (SDM) J. Dunlap whom [sic] opined that her physical impairments were non-severe."

Case 4:11-cv-00455-REL   Document 13   Filed 07/06/12   Page 35 of 37

There was no duty for the ALJ to further develop the record regarding plaintiff's physical impairments. The SDM, whose findings were reviewed by a State agency medical consultant, Joan Singer, Ph.D. (Tr. 52-53), noted plaintiff did not allege disability due to any physical impairment and concluded she had no severe physical impairment. It is plaintiff's responsibility to provide medical evidence to show that she is disabled. 20 C.F.R. §§ 404.1512 and 416.912.

There was no undeveloped issue here that required the ALJ to further develop the record. In addition, the ALJ did not mention or assign any weight to this opinion. The ALJ's findings do not indicate that she gave any weight to the SDM's opinion, as the ALJ found that plaintiff had a severe physical impairment of degenerative disc disease and gave plaintiff limitations in the residual functional capacity consistent with the finding of a severe physical impairment. Moreover, a psychologist who performed a consultative examination reviewed all of plaintiff's medical records and noted that plaintiff's MMPI test results showed an individual who liked to perceive herself as physically ill, which "may represent the displacement of psychic conflicts into the somatic domain."

Finally, plaintiff argues that the ALJ's finding that plaintiff could "sit, stand, or walk for six out of eight hours" was vague and confusing and could mean that plaintiff was able to sit, stand and walk not six hours, but six hours total and therefore was unable to work a full eight-hour day. This argument is wholly without merit. It is clear from the ALJ's opinion that plaintiff had the residual functional capacity to perform a range of "light work," which, according to SSR 83-10, generally "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." When asked in the hypothetical question about an individual who could "sit, stand or walk six out of eight hours," the vocational expert did not ask for clarification or interpret the hypothetical to mean that plaintiff could not work

36

a full day. Had the ALJ found plaintiff unable to perform any combination of activities for more than six hours total, the vocational expert would not have testified and the ALJ would not have concluded that plaintiff could perform other jobs that exist in the national economy. And finally, there is absolutely no evidence at all that plaintiff's sitting, standing, and walking were limited so severely. Dr. Jeffries, a treating orthopedic doctor, found only "a slight diminution in her ability to stand or walk." Plaintiff told her treating doctor Grace Dymek, M.D., that the only chronic health problem she had was heart disease/murmur. In June 2009 plaintiff told Dr. Burrell that she was "exercising regularly." Therefore, any finding by the ALJ that plaintiff's ability to stand or walk was limited to the extent suggested by plaintiff would have been unsupported by the record.

## VIII. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 6, 2012

37